# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 17, 2011 Session

## JEREMY MILLER v. JESSICA MILLER (TOLBE)

**Appeal from the Circuit Court for Montgomery County**
**No. MC CC CV FN 09-0164      Michael R. Jones, Judge**

_____

**No. M2010-00592-COA-R3-CV - FILED JULY 29, 2011**

_____

A Colorado court granted a divorce to married parents who were both active-duty members of the armed forces.  The court named the mother as the primary residential parent of their two minor children, and a parenting plan with flexible provisions was fashioned in the event of overseas deployment by one or both parents.  Both parties were deployed overseas at various times during the next five years.  The children spent the majority of that time in the care of the father, or, during father's deployments, in the care of his mother or his new wife. The father moved to Clarksville, Tennessee in April of 2007, and after living there with the children for eighteen consecutive months, he filed a petition in the Tennessee court for registration of the Colorado judgment and modification of the parenting plan.  He asked the court to name him as the children's primary residential parent.  After a hearing, the trial court granted the father's petition.  The mother argues on appeal that the trial court erred in finding that there had been a material change of circumstances which was unanticipated at the time of the divorce, and she contends that the father had therefore failed to meet the statutory threshold before a change in a parenting plan may be ordered under Tennessee law.  *See* Tenn. Code Ann. §  36-6-101(a)(2)(B).  She also argues that Tenn. Code Ann. § 36-6-113 limits the authority of the trial court to permanently modify the custody and visitation arrangements for the children of a mobilized parent.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Benjamin K. Dean, Clarksville, Tennessee, for the appellant, Jessica Miller (Tolbe).

John Terrance Maher, Clarksville, Tennessee, for the appellee, Jeremy Miller.

## OPINION

### I.  A COLORADO DIVORCE DECREE AND A PARENTING PLAN

This case presents a vivid example of the dislocations that the requirements of service can force military families to endure, especially when our forces are fighting overseas, resulting in multiple deployments for long stretches of time by both mothers and fathers. Although the parents in this case divorced when the children were quite young, and they remain at odds with each other over the most appropriate parenting arrangements for their children, the evidence indicates that the children are doing remarkably well, despite the frequent changes in custodians, residences, and schools that they have experienced. We describe some of those changes below.

Jeremy Miller ("Father") and Jessica Miller ("Mother") are both active-duty members of the United States Army.  They became the parents of two children, Jordan Miller (d.o.b. 9/7/98) and Jackson Miller (d.o.b. 6/8/01) during the course of their marriage.  The parties entered into a separation agreement in 2003, while they were both stationed in Colorado. Mother subsequently filed a petition for divorce in the District Court of El Paso County, Colorado.  The court reviewed the parties' separation agreement, and on February 20, 2004, it incorporated the agreement's provisions into a Decree of Dissolution of Marriage, a Support Order, and a Parenting Plan.

Under the heading of "Physical Location," the Parenting Plan declared that "[t]he children will reside with Mother," and it designated her as the custodian of the children, "solely for the purposes of the federal and state statutes which require a designation of determination of custody."  Father was granted specific visitation with the children "while both parties are in Colorado," including alternate weekends and dinner every Wednesday and Friday evening.  The plan decreed that both parents would make all major decisions regarding the children together.

The plan also provided that "once the parties separate to different states or countries due to military obligations, the children will spend the summers with the father."  Also, "[o]verall scheduling will be very flexible to provide for the best welfare of the children." Father was ordered to pay Mother $600 per month in child support, but in the event that the children were in his care for an extended period of time and he had to pay for daycare, "he will not be obligated to pay the mother child support for that month."

The following years showed ample evidence of the need for flexibility.  Both parties were members of units that were scheduled for deployment to Iraq in 2004.  Father's unit was

scheduled to deploy in November, and Mother's in December.[1]  The parties testified that they typically underwent a month of training prior to deployment.  In May of 2004, Mother asked Father to assume primary parenting responsibilities for the children, and they remained with him or with his new wife (Father remarried in August of 2004) from that time through Mother's deployment to Iraq in December 2004 and for several months after she returned from her deployment.

Mother returned from Iraq around November or December of 2005.  She re-enlisted and was transferred to Hawaii shortly thereafter.  At that time, Father was serving in Germany, and his wife was taking care of the children.[2]  In March of 2006 , Father's wife called Mother and told her she could no longer care for the children because of medical problems she was experiencing and an impending surgery.  The children were left in the care of Father's mother until April of 2006, when Mother arrived and took them to Hawaii to live with her.  However, Mother was scheduled to deploy once again in December of 2007.  Father was transferred to Fort Campbell in Clarksville, Tennessee in April of 2007, and at Mother's request, he took over the care of the children in that same month.

Father filed an administrative action for child support in Clarksville, which was transferred to Hawaii, and then sent back to the State of Tennessee.  The result was that Mother began paying Father child support of $400 per month in July of 2007, continuing through September or October of 2008 when she started paying support of $170 per month "in compliance with a modified support order."  She stopped paying support in December of 2008.

Mother deployed as scheduled, and she returned to Hawaii in March of 2009. Father's custody of the children after April of 2007 had continued for the next two years without any further changes, except for three weeks in November of 2007, when Mother took them out of school for three weeks and took them to Hawaii so they could be present at her wedding to her new husband, another member of the armed forces. He subsequently left active duty and became a member of the reserves.

---

[1]The evidence showed that Mother had deployed on two occasions prior to the divorce, and the children had lived with Father's mother during those deployments.

[2]Mother testified that Father served in Iraq, Afghanistan, and Germany at different times, but the testimony of the parties is not specific enough for us to construct an accurate timeline of his various deployments.

## II. A PETITION IN THE TENNESSEE COURT

On February 3, 2009 Father filed a petition in the Circuit Court of Montgomery County to register the Colorado decree of dissolution of marriage and to modify it. The petition stated that the children had resided with Father the vast majority of the time after the parties' 2004 divorce, but that because of deployments and other factors, they frequently had to move, living at different times in Colorado, Michigan, Indiana, and Hawaii. Father also stated that the children had been living with him in Clarksville since April of 2007, that they were currently enrolled in the Montgomery County Schools, and that he had been able to establish a stable environment for them. He accordingly asked the court to issue a restraining order to prevent Mother from removing the children from school.

Father alleged that Mother had previously withdrawn the children from school and kept them on several occasions for weeks at a time, that she relocated several times during the children's stays with her in Hawaii, and that she had been involved in domestic disputes with her boyfriend in the presence of the children, including one occasion when she "rammed her boyfriend's vehicle while her children were in the car." Father concluded that the children would be subjected to instability in their living and educational arrangements if he was not granted primary responsibility for their care. He also asked the court to award him child support. The court granted Father a temporary restraining order to prevent Mother from removing the children from school, from the jurisdiction of the Tennessee Court, or from the State of Tennessee.

Mother answered Father's petition on April 6, 2009. She asked that the restraining order be dissolved, denied that there had been a material change of circumstances such as would support the change in the parenting plan requested by Father, and she asked the court to restore her designation as the children's primary residential parent so they could live with her in Hawaii.

Mother admitted that she had been a victim of domestic abuse, but stated that she had obtained a restraining order against her former boyfriend and that he had been forced by the U.S. Army to resign his commission following the incident because of the offenses he had committed against her. She further stated that since she remarried in November of 2007, her new husband Matthew Tolbe had formed a close relationship with the two children and that she and Mr. Tolbe "have worked diligently to search and fund the anticipated private school education they desire for the two minor children to experience in Hawaii."

The restraining order was dissolved by Agreed Order on April 21, 2009. Under its terms, Mother was permitted to take the children to Hawaii for eight weeks of summer vacation, beginning on May 23, 2009, and continuing until July 25, 2009. She also was

given fall break and Christmas vacation in the same year, and she was required to bear all the associated transportation costs. The court reserved the question of child support, noting that the Hawaii family court was exercising jurisdiction over that issue at the time.[3]

On July 28, 2009, Father filed a petition for criminal contempt, alleging that Mother did not return the children to Tennessee as agreed and that she had failed to respond to his repeated requests for information about their return. Mother subsequently filed emergency petitions for temporary custody in both Hawaii and Tennessee, alleging that when the children were returned to her custody in May, they were malnourished and were in poor physical and emotional condition. The pleadings were accompanied by photographs of the children and by medical reports from physical examinations of both children in May of 2009, which stated that their weight was well below normal, that this was consistent with previous measurements in 2006 and 2008 indicating that they had always been small for their ages, and recommending dietary changes.

The Hawaii court continued Mother's petition to allow the Tennessee court to determine if a modification of the Agreed Order of April 21, 2009 was warranted. The Tennessee court conducted a hearing on the matter on August 6, 2009 and examined the evidence, after which it denied Mother's request for an emergency order on a finding that "the minor child's low weight has existed since shortly after birth and does not constitute an emergency situation."[4]

### III. THE HEARING ON THE MODIFICATION PETITION

The hearing on Father's petition for modification was conducted on November 12, 2009. Father and Mother were the only witnesses to testify. Father testified that whenever Mother asked him to take the children, he always agreed to do so regardless of any difficulties or inconvenience it might entail, because he wanted to make sure they were taken care of. He further testified that Mother had taken the children out of school several times over his objections so they could visit her, even though their absence from school caused difficulties both for them and for him.

---

[3]The record indicates that the Hawaii court subsequently declined to exercise jurisdiction over the matter and that the Tennessee court properly assumed jurisdiction under Tenn. Code Ann. § 35-6-216 and Tenn. Code Ann. § 36-6-218.

[4]The order resulting from the hearing of August 6, 2009 is signed by counsel for both parties and is titled "Agreed Order." Perhaps this reflects the fact that in addition to ruling on the petition for emergency custody, the court also set a date for final hearing on Father's petition for modification of the parenting plan.

Father also explained that because of the rank he had achieved and the unit he worked to become a member of, he can choose when he goes out on deployments, and that his unit deploys for periods of 60 days at a time rather than the 12 to 15 months that is customary for most units. He further testified that he had offered to help Mother obtain a transfer to Tennessee so she could spend more time with the children, but that she decided to remain where she was, even though lengthy deployments were a consequence of her being stationed in Hawaii.

Asked about the children's progress, Father testified that they both were very bright, and were doing well in school, that they were involved in sports and other extracurricular activities, and that his wife helps them with their homework and is always there for them, so they don't have to go to a babysitter after school. He also said the family sits down together for dinner every night and they do things on weekends, so that their life is "as close to a normal civilian life as we can with me being in the military."

Father stated that he believed it was important for the children to maintain a strong relationship with Mother, and he described one occasion before her first post-divorce deployment when she stayed at Father's house with him and his wife for two weeks so she could see the children and ease some of the financial problems she was having at that time. He testified that he encouraged the children to call Mother and that she got to speak with them "probably daily." Conversely, he asserted that when the children were with Mother, he was unable to reach them on a regular basis. He explained that when he tried calling, he usually had to leave a voice mail message and his phone calls were not returned. He further stated that he always kept Mother fully informed of any medical news regarding the children, but that when she was taking them to the doctor in Hawaii to obtain confirmation of her allegations of malnourishment, she refused to respond to his questions, telling him that it was "none of my business."

When Mother took the stand, her testimony painted a slightly different picture of the events of the post-divorce years than did Father's testimony. She denied that Father always took over the children's care every time she asked, emphasizing instead the amount of time he was unavailable because of his military obligations, with the result that their caretaker was often Father's wife or his mother, rather than Father himself. She admitted under further questioning, however, that any time Father was physically available to take the children, he did so.

Mother also insisted that on some of the occasions when Father took or maintained primary responsibility for the children before and after she deployed, it was because they both agreed for him to do so, in order not to interrupt the children's schooling. She also testified that prior to her December 2007 deployment, she had to train for 45 days on the big

island of Hawaii and an additional three months in California, so there was no way she could have kept the children during that time.

Addressing her current situation, Mother declared that "I have a home that I own and my life is in Hawaii right now." Mother had purchased the home a few months before her remarriage and was paying a mortgage of $3,320 per month. She testified that she had cut off all connection to her abusive former boyfriend and that she still had a restraining order against him. She and her new husband were expecting the birth of another child in the third week of February 2010. They had also found a private school that they thought would be right for the older children. She called it a "a year-round school" because breaks from classes for summer, fall, winter and spring were all relatively short. Tuition was between $600 and $700 per month. The evidence showed that at the time of trial, Mother was a Staff Sergeant, and was earning $6,700 per month from her army service.

Mother also testified that it was likely that her unit would deploy once again during the summer for a twelve month term in Iraq. She expressed the hope that her chain of command would be supportive of her status as a new mother and allow her to opt out of deployment, but she said that if they did not, she would try to leave the army. Mother was asked what she would do to support herself and the children and pay the mortgage and tuition if she were no longer in the army, and she responded, "I don't know what I would do. I would have to figure it out, but I can't do this anymore. I can't do this anymore. My kids can't do this anymore."

At the conclusion of proof and of closing arguments, the trial court took the matter under advisement. The court announced its decision in an opinion which was entered on November 18, 2009. It set out the history of the case in detail, compared the relative stability of the living conditions of both parties, and concluded that there had been a material change of circumstances that affected the welfare of the children, that the children "had flourished while under the continuous care of their father," and that their best interest required that Father be named as the primary residential parent. The opinion was incorporated into an order and a parenting plan, which was entered on February 8, 2010.

The court noted that Mother admitted that the children had been with Father for four out of the six years since the divorce and that Father testified that the children had been with him for 56 out of the 70 months since the divorce. While the court acknowledged that the original parenting plan contemplated that Father would have the children when Mother was deployed, it noted that Mother had not been deployed all of these 56 months, and that much

of the time she could have had the children with her if she had desired to do so.[5]

The parenting plan incorporated into the court's order provided that Mother would have substantially the same parenting time with the children as set out in the agreed order of April 21, 2009, including the entire summer vacation, fall and spring breaks, and every other winter break.[6] Mother was ordered to pay child support of $367 per month, which was a downward deviation from the child support guidelines to offset the transportation costs Mother would have to bear in order to exercise her parenting time.

The court also ordered Mother to pay retroactive child support arrearage to Father, dating from September 1, 2007 and amounting to $22,524. Mother filed a motion to alter or amend the judgment, asking the court to reconsider its retroactive modification of child support, and arguing that the arrearage should have been calculated from February 3, 2009 (the date of the filing of Father's petition for modification of the parenting plan), rather than from September 2007 (when the Hawaii Family Court initiated a support action against Mother). The parties subsequently entered into an agreed order resolving the issue by reducing the retroactive child support to $10,116.

Mother filed an appeal to this court, asking us to reverse the trial court's modification of the parenting plan.

### III.  PRINCIPLES GOVERNING MODIFICATION OF PARENTING PLAN

A decision on a request for modification of a parenting arrangement requires a two-step analysis. *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *See* Tenn. Code Ann. § 36-6-101(a)(2); *Kendrick v. Shoemake,* 90 S.W.3d 566, 575 (Tenn. 2002). Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick v. Shoemake,* 90 S.W.3d at 569; *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App.

___

[5]In this appeal, Mother attempts to make much of the differences in testimony as to the relative amounts of time she and Father have been responsible for parenting the children. It is undisputed, however, that in the five years between the parties' divorce and the filing of Father's petition for modification, Father has been the one to exercise parenting responsibility for the vast majority of the time.

[6]Mother complains on appeal that under the court's order, if she were deployed over the summer, she would lose her parenting rights for that season. However, Father promised that if that occurred, he would let her exercise parenting during the winter break, even if it was his turn under the schedule.

2006).[7]

As to the first requirement, *i.e.*, a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Cranston v. Combs,* 106 S.W.3d at 644 (citing *Kendrick v. Shoemake*, 90 S.W.3d at 570).

The question of whether a material change of circumstances has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007); *Murray v. Murray*, M2009-01576-COA-R3-CV, 2010 WL 3852218 (Tenn. Ct. App. Sept. 28, 2010) (No Tenn. R. App. P. 11 application filed). Our review of findings of fact in child custody or parenting plan cases is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Questions of law are reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.3d 87, 91 (Tenn. 1993).

---

[7]Tenn. Code Ann. § 36-6-101(a)(2)(B) sets out the requirement of a material change of circumstances if the issue before the court is "a modification of the court's prior decree pertaining to custody." Tenn. Code Ann. § 36-6-101(a)(2)(C) sets out the requirement of a material change of circumstances if the issue before the court is "a modification of the court's prior decree pertaining to a residential parenting schedule." The language of the two subsections is similar, but not quite identical. This court has interpreted the differences to mean that proof of a more substantial material change is required before the trial court can change the individual designated as the custodian of the children or as their primary residential parent under Tenn. Code Ann. § 36-6-101(a)(2)(B) than is required to make a less drastic change in a residential schedule under Tenn. Code Ann. § 36-6-101(a)(2)(C). The distinction between the two subsections is not relevant to the result of this case, because the material change alleged is sufficiently substantial to satisfy the requirements of either of them.

We are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Also, "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill,* 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). But despite the wide discretion that courts are empowered to exercise in such matters, "they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law." *See, also, Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

## IV. WAS THERE A MATERIAL CHANGE OF CIRCUMSTANCES?

Mother argues that the trial court erred in finding that a material change of circumstances had occurred, asserting that nothing that happened after the parties' divorce fell outside the parameters of the 2004 decree of the Colorado Court. She contends that the decree specifically anticipated that the scheduling of parenting time would at times depend upon the military obligations of the parties, and thus that any change that could be deemed to have occurred since then was not material because it was "known or reasonably anticipated when the order was entered."

Mother further contends that because the plan called for flexibility, it worked exactly as it was supposed to, so it does not need to be modified, although she concedes that a few small adjustments might be necessary. It appears to us, however, that the principle of flexibility cannot be stretched so far as to negate the primary provisions of the original parenting plan - that the children would reside with Mother and that she would remain their legal custodian or primary residential parent. The plan did not contemplate that Father would assume primary responsibility for the children for the vast majority of the time after divorce, or that Mother would leave them in his care for long periods both before and after her deployments.

We take at face value Mother's testimony that her agreement to place or keep the children in Father's care for such long periods was motivated by her concern for the children's welfare, in light of their school schedules and the demands of her pre-deployment training. But the rationale for those decisions negates the very purpose for designating a particular parent as the primary residential parent.

The flexibility incorporated into the parenting plan was meant to take into account the normal incidents of military service, including long deployments whose timing and duration are beyond the control of the individual soldier. But the testimony in this case indicates that the parties could exercise some degree of choice over their own assignments. Father had managed, through his rank and seniority, to obtain a stable assignment at Fort Campbell, involving only brief deployments, so he and his family could live a relatively normal life. Mother had requested that she be stationed in Hawaii and her request was granted, but the apparent cost of that desirable station was the likelihood of further long deployments. In this regard, it is significant that Father offered to help Mother to obtain reassignment to a unit at Fort Campbell or elsewhere where she would not be subject to such long deployments, but she declined because she wanted to remain in Hawaii.

In sum, the evidence does not preponderate against the trial court's finding that a material change of circumstances that affected the children's well-being in a meaningful way had occurred and, thus, that the threshold factor for a change to an existing parenting order has been satisfied. As for the second factor, the best interest of the children, Mother does not appeal the trial court's conclusion that their best interest is served by designating Father as their primary residential parent, so we need not discuss that question at length.

We note, however, that the evidence indicates that Father has demonstrated a willingness to encourage the children to maintain a strong relationship with Mother, while Mother had not shown an equal willingness to encourage their relationship with him. *See* Tenn. Code Ann. § 36-6-106(10). Further, Mother has acknowledged the likelihood that her unit will be ordered to deploy once again. If it does, and if she is unable to obtain some sort of exemption from deployment, the children will once again have to return to Father's household, thereby twice disrupting the continuity and stability of the parenting arrangement. *See* Tenn. Code Ann. § 36-6-106(3). If she manages to leave the army in order to avoid deployment, she herself testified that she has no plan for meeting her financial obligations or the material needs of herself or her children. The relative stability and certainty of Father's situation is thus more likely to serve their best interests.

## V. TENNESSEE CODE ANNOTATED § 36-1-113

Mother contends that by modifying the parenting plan as it did, the trial court violated the provisions of a statute recently enacted by our legislature for the protection of military parents. Tenn. Code Ann. § 36-6-113 reads in its entirety:

(a) As used in this section:
(1) "Armed forces" means the national guard and the reserve components of the armed forces, the United States army, the United States navy, the United

-11-

States marine corps, the United States coast guard, and the United States air force, and any other branch of the military and naval forces or auxiliaries of the United States or this state; and

(2) "Mobilized parent" means a parent who:

(A) Is a member of the armed forces; and

(B) Is called to active duty or receives orders for duty that is outside the state or country.

(b) A court shall not permanently modify a decree for child custody or visitation solely on the basis that one (1) of the parents is a mobilized parent.

(c)(1) A court of competent jurisdiction shall determine whether a temporary modification to a decree for child custody or visitation is appropriate for a child or children of a mobilized parent and, if appropriate, hold an expedited hearing if the exigencies of the mobilized parent's out-of-state assignment require immediate attention.

(2) The determination under subdivision (c)(1) includes consideration of any and all circumstances that are necessary to maximize the mobilized parent's time and contact with the parent's child that are consistent with the best interest of the child, including, but not limited to:

(A) The ordered length of the mobilized parent's call to active duty;

(B) The mobilized parent's duty station or stations;

(C) The opportunity that the mobilized parent will have for contact with the child through a leave, a pass or other authorized absence from duty;

(D) The contact that the mobilized parent has had with the child before the call to active military duty;

(E) The nature of the military mission, if known; and

(F) Any other factor that the court deems appropriate under the circumstances.

(3) The court shall allow for testimony to be given to the court by electronic means while the military parent is absent from the state if necessary.

(d) Any court-ordered modification of a child custody decree based on the active duty of a mobilized parent shall be temporary and shall revert back to the previous child custody decree at the end of the deployment, as appropriate.

(e) This section shall not limit the power of a court of competent jurisdiction to permanently modify a decree of child custody or visitation in the event that a parent volunteers for successive or frequent duties that remove the parent from the state and that make the parent unavailable to effectively supervise and care for a child.

Although the statute appears to be directed more towards members of the National Guard or military reserves than to permanent active-duty military personnel, its language is broad enough to encompass all members of all branches of the military, both inactive and active.

Mother specifically points to Tenn. Code Ann. § 36-6-113(b), which prohibits the courts from permanently modifying a decree for child custody or visitation solely on the basis that one of the parents is mobilized or deployed outside the state or country. That provision prevents a non-mobilized or non-deployed parent from taking unfair advantage of the service of the other parent by using that parent's temporary absence as a pretext for permanently altering an otherwise workable custodial arrangement. By its language, that provision does not apply to a parent who has been deployed out of state in the past but, instead, applies to a parent who "is a mobilized parent." Additionally, we do not interpret § 36-6-113(b) as precluding a court from considering the actual experience of the children due to past deployments as a factor in making a modification decision.

In any event, the legislature balanced the above provision by enacting Tenn. Code Ann. § 36-6-113(e), which acknowledges the continuing power of the court to permanently modify custody decrees in cases where successive or repeated deployments by the primary residential parent renders that parent unavailable on a long-term basis to effectively supervise and care for a child. We also believe that the reference to a parent who "volunteers" for such duties encompasses Mother's situation, where her voluntary re-enlistment and choice of duty station made her subject to a strong possibility of additional lengthy deployments beyond the ones she had already served, thereby making her potentially unavailable to care for her children once again. We accordingly hold that Tenn. Code Ann. § 36-6-113 did not preclude the trial court from acting as it did.

**IV.**

The judgment of the trial court is affirmed. We remand this case to the Circuit Court of Montgomery County for any further proceedings necessary. Tax the costs on appeal to the appellant, Jessica Miller Tolbe.

_____
PATRICIA J. COTTRELL, JUDGE

-13-